IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JESSICA CAGNETTI                      :
                                      :      CIVIL ACTION
            v.                        :
                                      :      NO. 18-5121
JUNIPER VILLAGE AT BENSALEM           :
OPERATIONS,                           :
   *dba JUNIPER COMMUNITIES*          :

## MEMORANDUM

**SURRICK, J.**                                           **JULY 17, 2020**

Presently before the Court in this employment discrimination matter is Defendant's

Motion for Summary Judgment. (ECF No. 28.)  For the following reasons, Defendant's Motion

will be granted in part and denied in part.

## I.      BACKGROUND

Wood River Village was a retirement community in Bucks County.  (Farewege Decl. ¶ 6,

SJ Mot. Ex. A, ECF No. 28-5.)  Plaintiff Jessica Cagnetti began working at Wood River Village

in April 2001, as a transportation aide.  She was 14 years old.  (Cagnetti Dep. 14-16, SJ Resp. Ex.

A, ECF No. 29-2.)  As a transportation aide, she brought residents to and from dinner.  (*Id*. at 16.)

Cagnetti also held various other positions at Wood River Village, including seating hostess,

waitress, prep cook, cook, and dishwasher.  She also stocked inventory, unloaded trucks, and

filled in for aides when needed.  (*Id*.)  For several years, Cagnetti never had any formal titles for

many of these positions.  She simply helped wherever it was needed.  Beginning in 2003, she

started performing cooking duties.  By 2010, Cagnetti was formally referred to as a cook and she

worked that job on a full-time basis.  (*Id*. at 16-18.)

On December 1, 2016, Defendant Juniper Village at Bensalem Operations, LLC acquired Wood River Village.  The business is now referred to as Juniper Village at Bucks County ("Juniper Village").  (Farewege Decl. ¶¶ 3-6.)  The day of the acquisition, Juniper Village hired Cagnetti as a full-time cook, at $13.00 per hour.  (SJ Mot. Ex. Q, ECF No. 28-21.)  She reported to Leitimore Collier, who was the kitchen director.  (Cagnetti Dep. 52-53.)

Shortly after Juniper Village took over the business, Cagnetti approached the then-executive director, Gerald McEvilly, and asked him for a raise.  Cagnetti told him that she believed she was being paid less than other cooks.  (Cagnetti Dep. 42-43.)  To her knowledge, Moses Barnes and Ryan Zolick, two other cooks who had recently left Juniper Village, had been earning $16.00 per hour and $15.00 per hour, respectively.  (*Id*. at 43-46.)  According to Cagnetti, they had no prior culinary experience.  (*Id*. at 46.)  After looking into the matter, McEvilly agreed that Cagnetti was being underpaid.  (*Id*. at 43.)  Effective September 1, 2017, Cagnetti's pay was increased from $13.00 per hour to $14.50 per hour.  (SJ Resp. Ex. E, ECF No. 29-2.)

On September 6, 2017, Juniper Village hired Joseph Cillo as a cook, at $17.00 per hour. (Cillo Dep. 12, SJ Mot. Ex. F, ECF No. 28-10; SJ Mot. Ex. T, ECF No. 28-24.)  Before working at Juniper Village, Cillo had about 18 years of cooking experience at various businesses, including a school, hotel, pizza shop, and catering company.  He also studied business and restaurant management for three years at the Art Institute of Philadelphia, where he obtained an associate degree in culinary science/restaurant management.  (Cillo Dep. 9-11; SJ Mot. Ex. G, ECF No. 28-11.)  In February of 2018, Juniper Village hired Joseph Melendez as a cook, also at $17.00 per hour.  (Cagnetti Dep. 59; SJ Mot. Ex. R, ECF No. 28-22.)  Before joining Juniper Village, Melendez had about 24 years of cooking experience at various restaurants.  He also

2

studied at Johnson & Wales culinary school in Miami, Florida.  (SJ Mot. Ex. S, ECF No. 28-23.)

At Collier's request, Cagnetti showed Cillo and Melendez around the kitchen and otherwise mentored them with respect to meal service, recipes, and diet needs.  (Cagnetti Dep. 52, 90.)  Collier and Phil Cohen, a morning supervisor, asked Cagnetti to give extra attention to Melendez.  (*Id*. at 52.)  Based on Cagnetti's interactions with Melendez and Cillo, she came to believe that they were making $18.00 per hour.  (*Id*. at 49-50.)

In October of 2017, Peter Farewege, Jr. became executive director of Juniper Village.  (Cagnetti Dep. 49; Farewege Dep. 15-16, SJ Mot. Ex. I, ECF No. 28-13.)  Several months later, on April 24, 2018, Cagnetti brought various workplace issues to his attention.  (Cagnetti Dep. 49.)  First, she told Farewege that she felt her pay was unfair in comparison to that of Cillo and Melendez, especially because she was their mentor and she had worked at the retirement community for years.  (*Id*. at 49-52; "Meeting Notes," SJ Resp. Ex. G, ECF No. 29-2.)[1] According to Cagnetti, she told Farewege that she thought her sex had something to do with the pay disparity.  (Cagnetti Dep. 70.)  According to Farewege's notes, however, Cagnetti did not raise the issue of sex discrimination.  (*See* Meeting Notes.)  Second, Cagnetti expressed her suspicion that Melendez was stealing food from the kitchen, based on her observation that he was frequently walking out of the retirement community with boxes of food.  (*Id*.; Cagnetti Dep. 63-66.)  Third, Cagnetti complained to Farewege about Melendez's behavior towards her and other workers.  For example, although Cagnetti never heard it for herself, Melendez allegedly referred to two Korean employees as "ping" and "pong."  (Cagnetti Dep. 57-58.)  Melendez also "picked

---

[1] Plaintiff's Exhibit G is a memorandum written by Farewege regarding his discussion with Plaintiff on April 24, 2018.  At his deposition, Farewege admitted that he did not author this or any other documentation of the April 24, 2018 meeting until after Cagnetti filed her EEOC complaint.  (Farewege Dep. 79-80.)

on" Cagnetti and another female coworker, Amanda Usewicz, because of their weight. (*Id*.)
With regard to Usewicz, Melendez said several times that she was "fat and nasty" and "couldn't
get a boyfriend [be]cause she looked like that." (*Id*. at 58.) With regard to Cagnetti, Melendez
called her "anorexic" and asked her if she used drugs. (*Id*. at 61.) In response to Cagnetti's
complaints, Farewege advised Cagnetti that he would look into the issues. (*Id*. at 71; Meeting
Notes.)

On May 18, 2018, Cagnetti's rate of pay was increased by 8%, to $15.66 per hour,
effective May 1, 2018. (Meeting Notes; "May 18, 2018 Status Change Form," SJ Resp. Ex. H,
ECF No. 29-2.) When Collier had Cagnetti sign paperwork related to her raise, she told him that
she still did not understand why Melendez was being paid more than she. (Cagnetti Dep. 74-75;
May 18, 2018 Status Change Form.) In response, Collier shook his head, which Cagnetti took to
mean that the issue was out of his hands. (Cagnetti Dep. 75.) With respect to the two other
issues Cagnetti raised with Farewege, Farewege never followed up with her. (*Id*. at 76.)
Meanwhile, Cagnetti continued to discuss her concerns with Collier on a weekly basis, but
nothing was ever done to address them. (*Id*. at 95, 135.)

On June 20, 2018, Cagnetti and Melendez got into a heated exchange, apparently over a
pineapple. ("Cagnetti's June 20, 2018 Incident Statement," SJ Resp. Ex. J, ECF No. 29-2;
Cagnetti Dep. 98-101.) Cillo was an eyewitness to at least some of the confrontation and had a
good relationship with Melendez. Cagnetti's account of the incident is inconsistent with that of
Melendez and Cillo. (*See* Cagnetti Dep. 98-101; Cagnetti's June 20, 2018 Incident Statement;
"Melendez's June 20, 2018 Incident Statement," SJ Mot. Ex. L, ECF No. 28-16; "Cillo's June 20,
2018 Incident Statement," SJ Mot. Ex. M, ECF No. 28-17; Cillo Dep. 20.) According to
Cagnetti, Melendez was the aggressor and had a nasty attitude, got in Cagnetti's face, poked her

in the chest, twice, and called her "bitch" and "cunt." (Cagnetti's June 20, 2018 Incident Statement; Cagnetti Dep. 98-99.) Cagnetti admits to using profanity herself. (Cagnetti Dep. 100.)

According to Melendez, Cagnetti was the one with the attitude, and it was Cagnetti who touched him. (Melendez's June 20, 2018 Incident Statement.) According to Cillo, Cagnetti pushed Melendez in the chest with both hands. Cillo admits that he did not see the entire confrontation and does not know who escalated the situation first. (Cillo's June 20, 2018 Incident Statement; Cillo Dep. 21-22.) In addition, Enid Bogochea, another employee, issued a signed statement indicating that during the argument, Melendez called Cagnetti a "bitch and said that he was tired of her shit." (SJ Resp. Ex. T, ECF No. 29-2.) There is no evidence that Bogochea was an eyewitness to the incident, and it is unclear when she issued her statement.

Cillo broke up the altercation. (Cillo's June 20, 2018 Incident Statement.) Afterwards, Cagnetti brought the matter to the attention of Cindy Hutchinson, who handled human resources issues. (Cagnetti Dep. 101; Hutchinson Dep. 12-14, SJ Resp. Ex. K, ECF No. 29-2; "Hutchinson Statement," SJ Resp. Ex. L, ECF No. 29-2.) The two discussed the issue in Hutchinson's office. Hutchinson then found Farewege, who joined the conversation. (Hutchinson Statement; Cagnetti Dep. 102.) Hutchinson and Farewege asked Cagnetti to write a statement explaining the incident and advised Cagnetti that she would be suspended pending investigation of the matter. (Cagnetti Dep. 102-04.) Cagnetti complied and wrote a statement. (Cagnetti's June 20, 2018 Incident Statement.) Melendez, Cillo, and Hutchinson also wrote statements. (*Id*.; Hutchinson Statement; Cillo's June 20, 2018 Incident Statement; Melendez's June 20, 2018 Incident Statement.) After leaving work that day, Cagnetti reported the incident to the police. (Cagnetti. Dep. 111.)

Two days later, on June 22, 2018, Melendez was issued a first and final written warning

for using vulgar language and approaching Cagnetti in an "aggressive manner by invading her personal space." (SJ Mot. Ex. O, ECF No. 28-19.) He was suspended for three days and required to undergo reeducation on Juniper Village's Code of Ethics and Standards of Conduct and Violence in the Workplace. (*Id.*) That same day, Hutchinson and Farewege notified Cagnetti that she was being terminated for her conduct. (Cagnetti Dep. 106-07.) According to the discipline form issued to Cagnetti, she "pushed" Melendez, thus engaging in "violence in the workplace." (SJ Resp. Ex. N, ECF No. 29-2.) When asked why Cagnetti was terminated, whereas Melendez was not, Farewege explained that he "did not corroborate that [Melendez] physically engaged. [He] did corroborate that [Plaintiff] physically engaged by pushing, and that was the reason she was terminated and that was the reason why [Melendez] was placed on a first and final" warning. (Farewege Dep. 155-56.)

Also on June 22, 2018, Collier issued a signed statement denying Cagnetti's numerous complaints about Melendez:

> I was never informed of any complaints or of harassment in any form involving Jess and Jose. I held several meeting[s] with Jess about how to conduct [herself] in situations that arise in the kitchen. She really did not like Jose. Because you do not like someone does not mean that is liable complaint [sic] or harassment against another employee.

(SJ Resp. Ex. Q, ECF No. 29-2.) Usewicz, about whom Melendez allegedly made disparaging remarks regarding her weight, also issued a signed statement on June 22, 2018, asserting tersely that she did "not feel as though [she was] being harassed by anybody at work." (SJ Resp. Ex. R, ECF No. 29-2; Cagnetti Dep. 57-58.)

Three days after Cagnetti's termination, another female employee, Cumy McDermott, issued a signed statement regarding Melendez. In the statement, she asserted that: (1) the first time she met Melendez, he said to her that "it was so nice to see a pretty face behind the desk for

6

a change"; (2) he asked her multiple times to go to social events with him; (3) he brought her breakfast and lunch, even though she did not ask for it; and (4) knowing that McDermott was married, he referred to himself as McDermott's "second husband."  (SJ Resp. Ex. V, ECF No. 29-2.)  Hutchinson and Farewege interviewed McDermott about her statement on July 16, 2018. At the meeting, McDermott confirmed that although she was concerned and annoyed by Melendez's comments, she did not feel uncomfortable or threatened.  (SJ Resp. Ex. W, ECF No. 29-2.)  On July 22, 2018, a former employee of Juniper Village, Matthew Wolak, issued a signed statement indicating that Melendez told him that he should join a gym and invited Wolak to a strip club, even though Wolak was only 17 years of age.  ("Wolak Statement," SJ Resp. Ex. U, ECF No. 29-2.)  Wolak also corroborated the "ping" and "pong" comments.  (*Id*.)

Several months after these events, effective October 1, 2018, another male cook at Juniper Village, Taylor Ferris, received a raise from $12.24 to $14.50 per hour.  (SJ Resp. Ex. 2, ECF No. 29-3.)  According to the record, he had worked as a cook at Juniper Village since December 2016 and was studying at Temple University, but he had no other culinary experience. (*Id*.)  On October 1, 2018, Dennis Keefe, another cook who had worked at Juniper Village since August 2015, received a raise from $14.50 to $16.00 per hour.  (SJ Resp. Ex. 4, ECF No. 29-3.) According to the record, he had a high school diploma and about 10 years of prior culinary experience.  (*Id*.)

In addition, on October 25, 2018, Juniper Village hired Jeffrey Schaefer as a cook, at $17.00 per hour.  (SJ Resp. Ex. 6, ECF No. 29-3.)  He had about seven years of prior culinary experience, an associate degree from the Culinary Institute of America, and a "ServSafe" certification, which appears to be related to food safety.  (*Id*.)  On November 21, 2018, Juniper Village rehired Wolak, who had previously resigned in May 2018.  ("Wolak Personnel File," SJ

7

Reply Ex. GG, ECF No. 32-2; Wolak Statement.)  Wolak returned as a cook, earning $10.00 per hour.  At that time, he had about two years of culinary work experience and had studied culinary arts at a technical high school.  (Wolak Personnel File.)

On January 21, 2019, Juniper Village hired Mark Harris as a cook, at $19.00 per hour. (SJ Reply Ex. FF, ECF No. 32-2.)  At the time, he had over 25 years of restaurant and catering experience, an associate degree in culinary arts from the Culinary Institute of America, and an associate degree in hotel and restaurant management from the Community College of Philadelphia.  (*Id*.)  On March 2, 2019, Juniper Village hired Daniel Alvarez as a cook, at $15.00 per hour.  (SJ Resp. Ex. 3, ECF No. 29-3.)  He had a high school diploma and had studied culinary arts at a community college for a year, but he did not obtain a degree.  He also had about seven years of culinary experience.  (*Id*.)  On March 6, 2019, Juniper Village hired Patrick Furlow as a cook, at $16.00 per hour.  (SJ Resp. Ex. 1, ECF No. 29-3.)  He had a high school diploma and about five years of culinary experience.  (*Id*.)

Finally, the record reveals that the highest paid cook at Juniper Village in the relevant timeframe was Philip Fischer, who earned $21.29 per hour as of December 1, 2016.  (SJ Resp. Ex. 5, ECF No. 29-3.)  His employment with Juniper Village began on December 1, 2016. Before that, he had been with Wood River Village since 1998.  The record indicates that he graduated high school, but it does not indicate any culinary experience prior to Wood River Village.  (*Id*.)  According to Farewege, cooks at Juniper Village are paid in accordance with their culinary training and experience.  (Farewege Dep. 136.)

On July 12, 2018, Cagnetti filed a charge of discrimination with the EEOC, alleging sex discrimination, retaliation, discrimination based on a disability, and hostile work environment. ("EEOC Charge," SJ Resp. Ex. 9, ECF No. 29-4.)  In her charge, Cagnetti reiterated the issues

that she raised with Farewege regarding Melendez.  (*Id.*)  On September 7, 2018, Cagnetti's

mother, Geraldine Cagnetti, who had worked at Juniper Village and the predecessor entity for

about 30 years, was terminated from Juniper Village.  (SJ Resp. Ex. 10, ECF No. 29-4.)  On

September 11, 2018, Geraldine Cagnetti also filed a charge of discrimination with the EEOC,

alleging sex discrimination, retaliation, discrimination based on a disability, and hostile work

environment.  According to the charge, after her daughter filed her EEOC complaint in July

2018, Geraldine Cagnetti was "subjected to increased hostility and animosity by [Defendant's]

management."  (*Id.*)

Cagnetti initiated this action on November 28, 2018.  (Compl., ECF No. 1.)  She filed an

Amended Complaint on July 17, 2019, alleging claims for: (Count One) retaliation, in violation

of Title VII, 42 U.S.C. § 2000e *et seq.*; (Count Two) sex discrimination (hostile work

environment, unequal pay, and wrongful termination) in violation of Title VII; (Count Three)

hostile work environment and retaliation, in violation of the Americans with Disabilities Act

("ADA"), 42 U.S.C. § 12101 *et seq.*; (Count Four) discrimination and retaliation, in violation of

the Equal Pay Act ("EPA"), 29 U.S.C. § 206, and Fair Labor Standards Act ("FLSA"), 29 U.S.C.

§ 215(a)(3); (Count Five) retaliation, in violation of the Pennsylvania Human Relations Act

("PHRA"), 43 Pa. Stat. § 951 *et seq.*; (Count Six) sex discrimination (hostile work environment,

unequal pay, and wrongful termination) in violation of the PHRA; and (Count Seven) hostile

work environment and retaliation, in violation of the PHRA.  (Am. Compl., ECF No. 26.)

Juniper Village filed the instant Motion for Summary Judgment on October 29, 2019.  (SJ

Mot., ECF No. 28.)  Plaintiff filed a Response in Opposition on November 19, 2019.  (SJ Resp.,

ECF No. 29.)  Juniper Village filed a Reply on December 6, 2019.  (SJ Reply, ECF No. 32.)

## II.     DISCUSSION

### A.     Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

Civ. P. 56(a).  When making this determination, we must weigh all facts in the light most

favorable to the non-moving party and draw all reasonable inferences in favor of the non-moving

party.  *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288 (3d Cir. 2018).  "For its part, '[t]he non-

moving party must oppose the motion and, in doing so, may not rest upon the mere allegations or

denials of his pleadings' but, instead, 'must set forth specific facts showing that there is a genuine

issue for trial.  Bare assertions, conclusory allegations, or suspicions will not suffice.'"  *Id*. at

288-89 (quoting *D.E. v. Central Dauphin Sch. Dist.*, 765 F.3d 260, 268-69 (3d Cir. 2014)).  "A

factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for

the nonmoving party.'"  *Id*. at 289 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986)).  "Conversely, 'where a non-moving party fails sufficiently to establish the existence of

an essential element of its case on which it bears the burden of proof at trial, there is not a

genuine dispute with respect to a material fact and thus the moving party is entitled to judgment

as a matter of law.'"  *Goldenstein v. Repossessors Inc.*, 815 F.3d 142, 146 (3d Cir. 2016) (quoting

*Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014)).

### B.     Judgment will be entered in favor of Juniper Village on Cagnetti's retaliation claims under Title VII and the PHRA (Counts One and Five)

Cagnetti alleges under Title VII and the PHRA that she was improperly terminated in

retaliation for reporting her concerns regarding race and sex discrimination at Juniper Village.

To establish a *prima facie* case of retaliation under Title VII or the PHRA, "a plaintiff must

10

tender evidence that: '(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action.'" *Moore v. City of Philadelphia*, 461 F.3d 331, 340-41 (3d Cir. 2006) (quoting *Nelson v. Upsala College*, 51 F.3d 383, 386 (3d Cir. 1995)).[2]  "If the employee establishes this *prima facie* case of retaliation … 'the burden shifts to the employer to advance a legitimate, non-retaliatory reason' for its conduct and, if it does so, 'the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action.'" *Id.* at 342 (quoting *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500-01 (3d Cir. 1997)).  "To survive a motion for summary judgment in the employer's favor, a plaintiff must produce some evidence from which a jury could reasonably reach these conclusions." *Id.*

For purposes of this Motion, Juniper Village concedes the first two elements of the *prima facie* case and asks us to find a lack of causation.  "[A] plaintiff may rely on a 'broad array of evidence' to demonstrate a causal link between [her] protected activity and the adverse action taken against [her]." *Marra v. Philadelphia Housing Auth.*, 497 F.3d 286, 302 (3d Cir. 2007) (quoting *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 284 (3d Cir. 2000)).  A plaintiff "can meet this burden by proffering evidence of an employer's inconsistent explanation for taking an adverse employment action, a pattern of antagonism, or temporal proximity unusually suggestive

---

[2] We will consider Plaintiff's Title VII and PHRA claims together because claims "brought pursuant to Title VII and the PHRA are generally analyzed under the same standards." *Burton v. Pennsylvania State Police*, 990 F. Supp. 2d 478, 500 n.30 (E.D. Pa. 2014) (citing *Wilkerson v. New Media Tech. Charter Sch. Inc.*, 522 F.3d 315, 318-19 (3d Cir. 2008)); *see also Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996) (Pennsylvania courts "generally interpret the PHRA in accord with its federal counterparts."); *Dykes v. Marco Grp., Inc.*, 222 F. Supp. 3d 418, 424 (E.D. Pa. 2016) ("We apply the same standard when analyzing discrimination claims brought pursuant to Title VII, the PHRA and Section 1981.").

of retaliatory motive." *Carvalho-Grevious v. Delaware State Univ.*, 851 F.3d 249, 260 (3d Cir. 2017) (internal citations and quotations omitted).  These, however, "are not the exclusive ways to show causation, as the proffered evidence, looked at as a whole, may suffice to raise the inference." *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997)).  In addition, a "crucial intervening fact" may "[break] the causal chain" when a plaintiff relies on temporal proximity to establish causation.  *See Wiler v. R&T Mech., Inc.*, 255 F. App'x 665, 668 (3d Cir. 2007); *see also Drwal v. Bor. of West View*, 617 F. Supp. 2d 397, 423-24 (W.D. Pa. 2009) (stating that an "intervening impropriety" by the employee between the protected activity and the adverse employment action "breaks the chain of evidence and timing alone under those circumstances will not be sufficient to establish a causal relationship").

Cagnetti reported her wage and harassment concerns to Farewege on April 24, 2018, and was terminated two months later, on June 22, 2018.  There are no hard and fast rules regarding what constitutes a "temporal proximity unusually suggestive of retaliatory motive."  Even giving Cagnetti the benefit of all reasonable inferences, however, we do not believe the temporal proximity theory of causation fits here.  There are two reasons for this.  First, several weeks after the meeting with Farewege, and before her termination, Cagnetti's hourly rate was increased.  An hourly rate increase is the opposite of an adverse employment action.  Second, although there are competing accounts of the June 20, 2018 confrontation between Cagnetti and Melendez, Cagnetti was not blameless.  Therefore, there was an intervening impropriety by Cagnetti that militates against application of the temporal proximity theory.

Since Cagnetti cannot proceed on a temporal proximity theory of causation, and since she does not elucidate any pattern of antagonism, inconsistent explanation by Juniper Village for taking adverse employment action, or any other facts giving rise to an inference of retaliation, she

cannot establish a *prima facie* case of retaliation.  Even if she could, Juniper Village has advanced a legitimate non-retaliatory reason for Cagnetti's termination, namely, her role in the June 20, 2018 incident.  Therefore, the burden shifts back to Cagnetti to show that Juniper Village's proffered reason for termination is pretextual and that retaliation was the real reason.  That is a burden Cagnetti cannot meet here.

To meet her burden on this last prong of the burden-shifting framework, a plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence.'"  *Fuentes v. Perksie*, 32 F.3d 759, 765 (emphasis in original) (quoting *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 531 (3d Cir. 1992)).  In other words, a plaintiff "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Id*. at 764.  "A plaintiff cannot defeat summary judgment simply by showing the reason was wrong, 'but that it was so plainly wrong it cannot have been the employer's real reason.'"  *Oden v. SEPTA*, 137 F. Supp. 3d 778, 789 (E.D. Pa. 2015) (quoting *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1109 (3d Cir. 1997)).  This standard "places a difficult burden on the plaintiff."  *Fuentes*, 32 F.3d at 765.

Cagnetti attempts to discredit Juniper Village's proffered reason for her termination by pointing out that Melendez's punishment for the June 20, 2018 incident was less severe than hers.  The record indicates that Juniper Village took varying degrees of disciplinary action against Cagnetti and Melendez based on the statements it obtained from them and from Cillo.  We could afford Cillo's recitation of events less weight because of his good relationship with Melendez and

13

the fact that he did not observe the entire confrontation.  However, that is not dispositive.  Cillo was not the decisionmaker, and the question is whether the *employer's* reason for termination was plainly wrong or implausible.  According to Farewege, Cagnetti was terminated—and Melendez was not—because Juniper Village could only corroborate Cagnetti's physical contact, and it was unable to corroborate Melendez's alleged physical contact.  This reasoning is not so plainly wrong that it is not deserving of belief.  Moreover, Cagnetti has not otherwise "succeeded in throwing enough doubt on [this explanation] so that a rational factfinder could reject it."  *See Fuentes*, 32 F.3d at 766.

Cagnetti suggests that Juniper Village's investigation of the June 20, 2018 incident was a sham because Juniper Village never obtained statements from other employees who may have been present for the altercation, such as Bogochea.  However, Bogochea's account is limited merely to having heard Melendez use a few profanities, thus indicating that she was likely not an eyewitness.  If she was not an eyewitness, she could not shed any light on the parties' physical contact, which Juniper Village regarded as determinative when implementing disciplinary action against Cagnetti and Melendez.  Finally, aside from Bogochea, Cagnetti does not identify any other employees with knowledge of the event, and "'[m]ere speculation about the possibility of the existence'" of other accounts "does not raise [a] triable issue to defeat [a] motion for summary judgment."  *See Bolge v. Wal-Mart Stores, Inc.*, No. 12-8766, 2015 WL 404527, at *3 (D.N.J. Jan. 29, 2015) (quoting *Sterling Nat'l Mortg. Co., Inc. v. Mortg. Corner, Inc.*, 97 F.3d 39, 45 (3d Cir. 1996)).[3]

_____

[3] Cagnetti also includes her mother's experience in her retaliation claims, asserting that after she filed her EEOC complaint, her mother was subject to "blatant retaliatory behavior and was also abruptly fired for a slew [of] false or severely exaggerated allegations by Juniper."  (SJ Resp. 9-10 n.8, 26-27.)  Although other courts have permitted retaliation claims to proceed on

14

Juniper Village's Motion will be granted with respect to Counts One and Five.

**C.   Judgment will be entered in favor of Juniper Village in part on Cagnetti's sex discrimination claims (Counts Two and Six)[4]**

*1.   Sex discrimination – hostile work environment*

To succeed on a sex-based hostile work environment claim, a plaintiff must show: "1) [he/she] suffered intentional discrimination because of his/her sex, 2) the discrimination was severe or pervasive, 3) the discrimination detrimentally affected the plaintiff, 4) the discrimination would detrimentally affect a reasonable person in like circumstances, and 5) the existence of *respondeat superior* liability." *Mandel v. M&Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013). Cagnetti has raised a genuine issue of material fact as to all five elements.

With regard to the first element, "'[t]he critical issue … is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.'" *Rorrer v. Cleveland Steel Container*, 712 F. Supp. 2d 422, 427 (E.D. Pa. 2010) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)). "A plaintiff must show gender is a substantial factor in the discrimination and that, if not for her gender, she would not have been treated in the same manner." *Duckett v. Dep't of Health & Human Servs.*, No. 18-4017, 2019 WL 3216612, at *4 (E.D. Pa. July 17, 2019) (citing *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482 (3d Cir. 1990)). "Nevertheless, impermissible discrimination need not include sexual overtones in *every* instance." *Id.* (emphasis in original) (citing *Andrews*, 895 F.2d at 1485). "'[T]he pervasive use of derogatory and insulting terms

---

similar grounds, *see Sterner v. County of Berks*, No. 13-1568, 2014 WL 1281241, at *8 (E.D. Pa. Mar. 28, 2014), Cagnetti's evidence on this point consists entirely of conclusory allegations, which cannot create a genuine issue of fact for purposes of defeating summary judgment.

relating to women generally and addressed to female employees personally may serve as evidence of a hostile environment.'" *Id*. (quoting *Andrews*, 895 F.2d at 1485).

Cagnetti has established intentional sex discrimination. Melendez's comments towards her and other women dealt with female employees' weights, body size, image, and ability to get a boyfriend. Although there is evidence that Melendez made at least one comment to a male employee regarding body and weight, the record shows that the overwhelming majority of his comments were made and pertained to women.

To prove the second element, the plaintiff "must show that her workplace was 'permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Rorrer*, 712 F. Supp. 2d at 428 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). This depends on a totality of the circumstances, "including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it interferes with an employee's work performance.'" *Id*. (quoting *Harris*, 510 U.S. at 23). "'Incidents involving employees other than the plaintiff are also relevant in establishing [a] generally hostile work environment,'" so long as the "plaintiff was aware of the incidents and [] such incidents affected plaintiff's psychological well-being." *Id*. (quoting *Velez v. QVC*, 227 F. Supp. 2d 384, 410 (E.D. Pa. 2002)).

Based on the record before us, one could reasonably infer that Melendez persistently made humiliating comments to and about women, such that one could find the existence of an abusive working environment. Although other female coworkers whom Melendez targeted

---

[4] Counts Two and Six, which are brought under Title VII and the PHRA, respectively, will be considered together. *See supra* n.2.

asserted that they did not feel harassed or uncomfortable, references to women as "fat and nasty," unable to get a boyfriend for "looking like that," and "anorexic" are clearly degrading.

With regard to the third element, while a plaintiff need not establish a "tangible psychological injury," she must, at the very least, "subjectively perceive the environment to be abusive." *See Harris*, 510 U.S. at 23; *Rorrer*, 712 F. Supp. 2d at 429. Here, Cagnetti was bothered enough by Melendez's conduct to report him to Farewege and Collier. That is enough to establish a detrimental effect from the discriminatory activity.

The fourth element asks whether the subject conduct is "objectively hostile or abusive, as opposed to subjectively so." *Rorrer*, 712 F. Supp. 2d at 429 (citing *Harris*, 510 U.S. at 21). "Evidence that others were harassed may serve to bolster objective reasonableness of a plaintiff's claims." *Id*. at 430 (citing *Anderson v. Deluxe Homes of PA, Inc.*, 131 F. Supp. 2d 637, 647 (M.D. Pa. 2001)). As we have indicated, Melendez's comments were problematic. In addition, Cagnetti was not the only one who brought his conduct to the attention of management. Although she ultimately admitted that she did not feel uncomfortable or threatened, McDermott issued a signed statement critical of some of Melendez's advances towards her. This element, too, should be decided by a jury.

Finally, with respect to *respondeat superior* liability, "'[w]hen the hostile work environment is created by … non-supervisory coworkers,' employers are 'not automatically liable' in all instances." *In re Tribune Media Co.*, 902 F.3d 384, 400 (3d Cir. 2018) (quoting *Huston v. Procter & Gamble Paper Prods. Corp.*, 568 F.3d 100, 104 (3d Cir. 2009)). "'Rather, employer liability … exists only if [(1)] the employer failed to provide a reasonable avenue for complaint or … [(2)] the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action.'" *Id*. (quoting *Huston*, 568 F.3d at 104). For an

avenue for complaint to be reasonable, it must be "effective."  *See Rorrer*, 712 F. Supp. 2d at 430 (citing *Bouton v. BMW of North Am. Inc.*, 29 F.3d 103, 110 (3d Cir. 1994)).

Cagnetti reported Melendez's conduct to at least two supervisors or management-level employees on multiple occasions.  It appears that nothing was ever done to address Cagnetti's concerns until the June 20, 2018 incident forced Juniper Village to take notice.  For purposes of summary judgment, this is sufficient evidence of both an ineffective avenue for complaint and a failure by Juniper Village to take prompt and appropriate remedial action.  Juniper Village asserts that Melendez "was disciplined by Juniper within two days of Cagnetti's report." (SJ Br. 18, ECF No. 28-2.)  Juniper Village is mistaken.  Although Melendez was disciplined within two days of the June 20, 2018 incident, he was not disciplined at all for almost two months after Cagnetti complained about his misogynistic comments to Farewege on April 24, 2018.

### 2.     Sex discrimination – unequal pay

To establish a *prima facie* case of sex discrimination under Title VII, a claimant must show that: "(1) she was a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) members of the opposite sex were treated more favorably."  *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013).  "A plaintiff may also meet the last element by showing that the adverse employment action 'occurred under circumstances that could give rise to an inference of intentional discrimination.'"  *Id*. (quoting *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008)).  "Once the plaintiff makes out her prima facie case, 'the burden of production [then] shifts to the defendant to offer a legitimate non-discriminatory [justification] for the adverse employment action.'"  *Id*. (quoting *Smith v. City of Allentown*, 589 F.3d 684, (3d Cir. 2009)).  "This burden is 'relatively light' and is satisfied if the employer provides evidence, which, if true, would permit a conclusion that it took the adverse

employment action for a non-discriminatory reason."  *Id*. (quoting *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006)).  "At this stage, 'the defendant need not prove that the articulated reason actually motivated its conduct.'"  *Id*. (quoting *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 189 (3d Cir. 2003)).

If the defendant satisfies its burden, the plaintiff must then "provide evidence from which a factfinder could reasonably infer that the employer's proffered justification is merely a pretext for discrimination."  *Id*. (citing *Fuentes*, 32 F.3d at 764-65).  "To make a showing of pretext, 'the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'"  *Id*. at 427 (quoting *Fuentes*, 32 F.3d at 764).  "The plaintiff's evidence, if it relates to the credibility of the employer's proffered justification, 'must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence.''"  *Id*. (quoting *Fuentes*, 32 F.3d at 765).  "[I]f a plaintiff has come forward with sufficient evidence to allow a finder of fact to discredit the employer's proffered justification, she need not present additional evidence of discrimination beyond her prima facie case to survive summary judgment."  *Id*.  In other words, the plaintiff is "not required to produce direct evidence of discriminatory intent to demonstrate pretext and survive a motion for summary judgment."  *Id*.

Juniper Village concedes the first two elements of Cagnetti's discrimination claim based on unequal pay.  However, according to Juniper Village, Cagnetti cannot establish an adverse employment action because both times that she complained about unequal pay, she received a

raise.  We disagree.  First, the crux of a Title VII claim for pay discrimination is unequal pay for equal work.  *See Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1087 (3d Cir. 1996).  Even after a raise, a claimant could still be getting paid less than her male counterparts for the same work.  Second, even if the raise closes the pay gap, there still will have been a period of discriminatory pay.

The fourth element of the *prima facie* case, in the context of pay discrimination, requires a plaintiff to establish that "similarly situated employees of the opposite sex were treated more favorably."  *Summy-Long v. Pennsylvania State Univ.*, 226 F. Supp. 3d 371, 395 (M.D. Pa. 2016) (collecting cases), *aff'd*, 715 F. App'x 179 (3d Cir. 2017).  "The fact that two employees share a job title is insufficient by itself to support an inference that they are suitable comparators."  *Reid v. Wal-Mart Stores, Inc.*, 274 F. Supp. 3d 817, 823 (N.D. Ill. 2017) (citing *Tank v. T-Mobile USA, Inc.*, 758 F.3d 800, 810 (7th Cir. 2014)).  "Typically there must also be evidence that the employees 'were subject to the same standards and compensation scheme, or had comparable experience, education, or qualifications.'"  *Id.* (quoting *Tank*, 758 F.3d at 810); *Herster v. Bd. of Supervisors of Louisiana State Univ.*, 887 F.3d 177, 185 (5th Cir. 2018) ("A variety of factors are considered when determining whether a comparator is similarly situated, including job responsibility, experience, and qualifications."); *Rossi v. New Jersey*, 39 F. App'x 706, 709 (3d Cir. 2002) (affirming summary judgment in favor of employer on Title VII pay discrimination claim where higher-paid comparators identified by employee were "all significantly more experienced").

Cagnetti identifies various male cooks with varying levels of culinary experience and education.  We summarize their respective experience and pay as follows:[5]

| Employee | Approximate Years of Culinary Experience | Attended Culinary School/Obtained Culinary Degree | Hourly Rate at Juniper Village in Relevant Timeframe |
|---|---|---|---|
| Plaintiff | 15 | No | $13.00 - $15.66 |
| Cillo | 18 | Associate Degree | $17.00 |
| Melendez | 24 | Yes, but record does not indicate type of degree | $17.00 |
| Ferris | 2 | No | $12.24 - $14.50 |
| Keefe | 10 | No | $14.50 - $16.00 |
| Schaefer | 7 | Associate Degree, Certification | $17.00 |
| Wolak | 2 | No | $10.00 |
| Harris | 25 | 2 Associate Degrees | $19.00 |
| Alvarez | 7 | Some School | $15.00 |
| Furlow | 5 | No | $16.00 |
| Fischer | 20 | No | $21.29 |
| Barnes | 0 (uncertain) | No | $16.00 |
| Zolick | 0 (uncertain) | No | $15.00 |

At first glance, there appears to be no standard measure as to how a Juniper Village cook's pay rate was determined.  For example, Cillo and Melendez were earning only $1.00 per hour more than Furlow, even though they had significantly more experience than he, as well as formal culinary education (whereas Furlow had none).  Alvarez was earning less than Furlow, even though Alvarez had more experience and some culinary schooling.  Ferris and Wolak had similar backgrounds, but their hourly pay was markedly different.  The inconsistencies are many.

---

[5] This chart is not perfect.  The record before the Court does not allow us to determine with precision the nature and extent of the experience of these employees.  We do not know their exact duties in the kitchen, or the exact timeframes in which their various hourly rates were effective.

However, these issues are beside the point.  We are called on to compare Cagnetti to her similarly situated male counterparts.  Here, Furlow, Keefe, Barnes, and Zolick, like Cagnetti, had no formal culinary education.  They differ from Cagnetti in that they had significantly less culinary experience than she.  Yet, they were earning nearly as much as or more than Cagnetti during the relevant time period.  For purposes of summary judgment, Cagnetti has set forth sufficient comparator evidence to establish an inference of discrimination.  *Cf. Smith v. Walgreen Co.*, 964 F. Supp. 2d 338, 352 n.11 (D. Del. 2013) (noting that a pay discrimination claimant can meet her burden of proof by relying on only one comparator (citing *Simpson v. Kay Jewelers*, 142 F.3d 639, 646-47 (3d Cir. 1998))).

Since Cagnetti has established a *prima facie* case, the burden shifts to Juniper Village to provide a legitimate, non-discriminatory reason for paying Cagnetti less than her male counterparts.  Juniper Village focuses primarily on Melendez and Cillo, noting that they had more experience and formal training than Cagnetti.  However, Cagnetti's claims are not just about Cillo and Melendez.  We are drawn primarily to the pay discrepancy between Cagnetti and her other male coworkers.  In support of its position that there was no unlawful pay discrepancy between Cagnetti and those individuals, Juniper Village asserts that the cooks were paid based on experience and takes the position that Cagnetti had only five years of culinary experience—from the time she formally became a "cook"—rather than the 15 or more she alleges.  Juniper Village also brushes Cagnetti's evidence aside as "inapposite pay comparisons based on differing points in time."  (SJ Reply 6.)

First, these arguments do not account for the pay discrepancy between Cagnetti and Barnes and Zolick.  We are aware of the fact that Barnes and Zolick were no longer with Juniper Village at the time of the case-critical events in 2018.  However, Cagnetti has raised an issue of

fact regarding the pay discrepancy that existed prior to 2018.  Second, the inconsistencies in the

cooks' hourly rates undermine Juniper Village's proffered explanation that the cooks were paid

based on experience.

### 3. Sex discrimination – wrongful termination

"To state a prima facie case of discrimination under Title VII, [a plaintiff] must allege that

he is (1) a member of a protected class; (2) who was qualified for his position; and (3) who was

discharged 'under conditions that give rise to an inference of unlawful discrimination.'"  *Santos*

*v. Iron Mountain Film & Sound*, 593 F. App'x 117, 119 (3d Cir. 2014) (quoting *Geraci v.*

*Moody-Tottrup, Int'l, Inc.*, 82 F.3d 578, 580-81 (3d Cir. 1996)).  "The Third Circuit has adopted

a flexible view of this test, rejecting the requirement that a plaintiff compare herself to a similarly

situated individual from outside her protected class to raise an inference of unlawful

discrimination."  *Clair v. Agusta Aerospace Corp.*, 592 F. Supp. 2d 812, 818 (E.D. Pa. 2009)

(citing *Sarullo v. United States Postal Serv.*, 352 F.3d 789, 798 n.7 (3d Cir. 2003)).

"Importantly, however, a plaintiff 'must establish some causal nexus between [her] membership

in a protected class' and the adverse employment decision complained of."  *Id*. (quoting *Sarullo*,

352 F.3d at 798).  Once a plaintiff establishes a *prima facie* case of discrimination on this basis,

the remaining steps of the familiar three-step burden-shifting framework apply.  *See Geraci*, 82

F.3d at 580-81.

For this claim, the only issue in dispute at this juncture is whether Cagnetti was

discharged because of her sex.  Cagnetti, in reliance on *Van Heest v. McNeilab, Inc.*, 624 F. Supp.

891, 898 (D. Del. 1985), asserts that the fact that Juniper Village replaced her with male cooks

gives rise to an inference of unlawful discrimination.  *Van Heest* is distinguishable.  It did not

address a wrongful termination claim.  In *Van Heest*, the plaintiff's theory of sex discrimination

was based on unfair and unequal pay, and the court found that the replacement of the female plaintiff with two males "who were paid much more than plaintiff," along with other pay discrepancies, supported an inference of discrimination in that context.  *Id*. at 898-99.  *Van Heest* does support Cagnetti's Title VII unequal pay claim, which we have concluded may proceed. Indeed, after Cagnetti's termination, Juniper Village hired Furlow, whose starting hourly rate as a cook was higher than Cagnetti's ending rate, even though he did not have as much culinary experience as Cagnetti.

With regard to Cagnetti's wrongful termination claim, we note that based on the record, an overwhelming majority of Juniper Village's cooks were men, and after Cagnetti's termination, Juniper Village hired multiple additional cooks, all of whom were men.  Although courts seem reluctant to allow sex discrimination claims to proceed solely on the basis of a "male-dominated" work environment, they appear to give more credence to such arguments when the employer takes affirmative measures to retain or hire men, but does not make the same effort with respect to women.  *See*, *e.g.*, *Fletcher v. Lucent Techs. Inc.*, 207 F. App'x 135, 137-38 (3d Cir. 2006); *Hallquist v. Local 276, Plumbers & Pipefitters Union, AFL-CIO*, 84 F.2d 18, 24-25 (1st Cir. 1988).

Here, there is no direct evidence that Juniper Village purposefully took steps to create or maintain a male-dominated kitchen, much less that Juniper Village terminated female cooks to advance that goal.  Simply put, we are unable to ascertain any causal relationship between Cagnetti's sex and her termination.  Even if we could, as we have already determined, Juniper Village has met its burden of identifying a legitimate, non-discriminatory reason for Cagnetti's discharge:  Plaintiff's involvement in the June 20, 2018 altercation.  Because Cagnetti is unable

to meet her burden of establishing that reason as a pretext for her termination, she could not

proceed on her sex-based wrongful termination claim in any event.  *See Fuentes*, 32 F.3d at 764.

To summarize, Counts Two and Six of the Amended Complaint will be dismissed to the

extent they allege wrongful termination.  The hostile work environment and unequal pay claims

in Counts Two and Six may proceed to trial.

### D.   Judgment will be entered in favor of Juniper Village on Cagnetti's disability claims (Counts Three and Seven)

#### 1.   ADA/PHRA – hostile work environment

Counts Three and Seven of the Amended Complaint allege disability-related hostile work

environment and retaliation, in violation of the ADA and PHRA.[6]  "To succeed on a hostile work

environment claim under the ADA, the employee must show the following five factors:

> (1) [she] is a qualified individual with a disability under the ADA; (2) she was
> subject to unwelcome harassment; (3) the harassment was based on her disability
> or a request for an accommodation; (4) the harassment was sufficiently severe or
> pervasive to alter the conditions of her employment and to create an abusive
> working environment; and (5) [the employer] knew or should have known of the
> harassment and failed to take prompt effective remedial action.

---

[6] Before the passage of the ADA Amendments Act of 2008, courts generally considered the ADA and PHRA coextensively.  *See Gardner v. SEPTA*, 410 F. Supp. 3d 723, 734 n.5 (E.D. Pa. 2019).  However, because the ADAAA relaxed the definition of disability, whereas there has been no similar change to the PHRA, some courts have since considered ADA and PHRA claims separately.  *See, e.g., Rubano v. Farrell Area Sch. Dist.*, 991 F. Supp. 2d 678, 689 n.7 (W.D. Pa. 2014).  Here, "[t]hat discrepancy is of no moment … since the Court [concludes] that plaintiff cannot meet the relaxed standard for disability under the ADA, [and] [i]t would logically follow … that [P]laintiff cannot satisfy the more heightened standard of disability under the PHRA." *Wilson v. Iron Tiger Logistics, Inc.*, 62 F. Supp. 3d 412, 417 (E.D. Pa. 2014), *aff'd*, 628 F. App'x 832, 836 (3d Cir. 2015) (holding that "because [plaintiff] cannot establish the disabled element of his ADA claim, his PHRA claim necessarily fails because he similarly cannot show he is disabled under that statute"); *see also Jeffrey v. Thomas Jefferson Univ. Hosp., Inc.*, No. 17-0531, 2019 WL 2122989, at *9 n.6 (E.D. Pa. May 14, 2019) (noting that aside from the definition of disability, "all other elements of the claims under each statute are analyzed in the same manner"); *Rubano*, 991 F. Supp. 2d at 689 n.7 (same).

*Ballard-Carter v. Vanguard Grp.*, 703 F. App'x 149, 151-52 (3d Cir. 2017) (quoting *Walton v. Mental Health Ass'n*, 168 F.3d 661, 667 (3d Cir. 1999)).

The ADA regards a disabled person "as someone who (1) has a physical or mental impairment that substantially limits one or more major life activities; (2) has a record of such an impairment; or (3) is regarded as having such an impairment."  42 U.S.C. § 12102(1); *Rubano v. Farrell Area Sch. Dist.*, 991 F. Supp. 2d 678, 690 (W.D. Pa. 2014).  According to the Amended Complaint, Cagnetti is pursuing her disability claims based on "Melendez's perception of her having disabilities," insofar as he "repeatedly call[ed] her anorexic and ask[ed] her whether she was on drugs or was a drug addict."  (Am. Compl. ¶¶ 50-54, 65-66.)  Based on her allegations and the lack of any evidence indicating that Cagnetti actually suffered from either of these conditions, we construe Cagnetti's claims as being based upon her having been "regarded as" having an impairment.  *See* 42 U.S.C. § 12102(1).

"An individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to [unlawful employment activity] because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity."  42 U.S.C. § 12102(3)(A).  "After the 2008 amendments to the ADA definition of disability, all that an ADA plaintiff must show to raise a genuine issue of material fact for the 'regarded as' prong is that a supervisor knew of the purported disability."  *Rubano*, 991 F. Supp. 2d at 693; *see also Palish v. K&K RX Servs., L.P.*, No. 13-4092, 2014 WL 2692489, at *9 (E.D. Pa. June 13, 2014) (stating that "a plaintiff can establish a genuine issue of fact for 'regarded as' disability by showing that a decisionmaker knew of the impairment").

26

Although Melendez's statements regarding anorexia and drug use were unsavory, those comments alone, from a non-supervisory coworker, cannot establish that Cagnetti was regarded by Juniper Village as having a disability.  There is also no evidence that any supervisory Juniper Village employees made similar comments to Cagnetti or believed she had any disabilities. Moreover, Cagnetti has not established that Melendez actually believed that she suffered from anorexia or drug addiction.  Given Melendez's history of making all types of insults to all types of people, his statements regarding anorexia and drug addiction very well may have been part of his constant effort to demean, rather than motivated by his "perception" that Cagnetti suffered from a disability.  *See* 42 U.S.C. § 12102(3)(A).  Cagnetti has not shown otherwise.  *See Garton v. BWXT Tech. Servs. Grp., Inc.*, No. 17-222, 2020 WL 86197, at *5 (D. Idaho Jan. 7, 2020) (granting summary judgment in favor of employer on "regarded as" hostile work environment claim where employee failed to show that his coworker mistreated him "because [he] regarded [plaintiff] as having anxiety and depression"); *Cooper v. CLP Corp.*, No. 13-2152, 2015 WL 9311964, at *6 (N.D. Ala. Dec. 23, 2015) (granting summary judgment in favor of employer on "regarded as" claim, noting that while supervisor's "statements are clearly commentary on the plaintiff's physical appearance, they do not demonstrate that she regarded him as having an impairment"), *aff'd*, 679 F. App'x 851 (11th Cir. 2017); *see also Jakomas v. City of Pittsburgh*, 342 F. Supp. 3d 632, 648-49 (W.D. Pa. 2018) (noting that to survive summary judgment on a "regarded as" claim, the plaintiff must "produce sufficient evidence such that a factfinder could reasonably infer that the employer engaged in the prohibited action *because of* an actual or perceived impairment" (emphasis added)).[7]

---

[7] Other cases relying on pre-ADAAA law support our conclusion that offensive comments alone cannot give rise to a "regarded as" claim.  *See, e.g., Ramage v. Rescot Sys. Grp.*, Inc., 834

Accordingly, Cagnetti has failed to establish that she was a qualified individual with a disability under the ADA, and her ADA hostile work environment claim cannot proceed.  *See Amorosi v. Molino*, No. 06-5524, 2009 WL 737338, at *6-7 (E.D. Pa. Mar. 19, 2009) ("A claim for hostile work environment based on disability requires an evidentiary showing that, inter alia, the plaintiff is a qualified individual with a disability under the ADA.").

>    2.    *ADA/PHRA – retaliation* [8]

Cagnetti alleges that she was terminated in retaliation for reporting Melendez's comments about anorexia and drug use.  (Am. Compl. ¶ 53.)  Retaliation claims under the ADA are analyzed "under the same framework [the courts] employ for retaliation claims arising under Title VII."  *Krouse*, 126 F.3d at 500.  "'[P]rotesting what an employee believes in good faith to be a discriminatory practice is clearly protected conduct'" under the ADA.  *Tyson v. Access Servs.*, 158 F. Supp. 3d 309, 315 (E.D. Pa. 2016) (quoting *Aman*, 85 F.3d at 1085).  In other words, a "plaintiff need not establish that the conduct she opposed actually constituted a violation of the ADA as long as she alleges 'the predicate for a reasonable, good faith belief that the

---

F. Supp. 2d 309, 325 (E.D. Pa. 2011) (holding that plaintiff failed to establish a *prima facie* "regarded as" ADA violation based on coworker's inappropriate behavior where coworker was not plaintiff's supervisor and had no role in the decision to terminate her); *Scott v. Napolitano*, 717 F. Supp. 2d 1071, 1087 (S.D. Cal. 2010) (finding that supervisor's disparaging comments about employee's mental health did not violate ADA where supervisor "had a personal vendetta against" employee and "did not actually *believe* that [employee] was disabled as a result of a mental condition" (emphasis in original)); *Roberts v. Dimension Aviation*, 319 F. Supp. 2d 985, 990 (D. Ariz. 2004) (finding that the plaintiff failed to establish that he was regarded as disabled based on his coworker's insults, such as "walleye" and "one eye," in reference to the plaintiff's strabismus, reasoning that although the coworkers' actions were "certainly not nice, it does not lead to the conclusion that Plaintiff was regarded as disabled").  Although these cases are not essential to our determination, we believe that the principles espoused by these cases are consistent with the post-ADAAA cases on which we rely.

behavior she is opposing violates the ADA.'" *Id.* (quoting *Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205, 216 (4th Cir. 2002)); *see also Moore*, 461 F.3d at 341 (noting that "the employee must hold an objectively reasonable belief, in good faith, that the activity they oppose is unlawful"); *cf. Wilkerson v. New Media Tech. Charter Sch. Inc.*, 522 F.3d 315, 322 (3d Cir. 2008) (holding that "if no reasonable person could have believed that the underlying incident complained about constituted unlawful discrimination, then the complaint is not protected"). A plaintiff may reasonably believe that even "a single incident … could amount to unlawful activity." *Castleberry v. STI Grp.*, 863 F.3d 259, 267 (3d Cir. 2017).

In her July 12, 2018 EEOC complaint, which she filed less than three months after her April 24, 2018 meeting with Farewege, Cagnetti regarded Melendez's comments about anorexia and drugs as disability discrimination. (EEOC Charge.) We understand that Cagnetti's EEOC complaint may contain self-serving statements. Nevertheless, Cagnetti's retelling of events in her EEOC complaint, less than three months after the events complained of, is probative of her beliefs at the time Melendez made his comments. Accordingly, Cagnetti has raised a genuine issue of fact with respect to whether she engaged in a protected activity.

Like her other retaliation claims in Counts One and Five, however, Cagnetti's disability-based retaliation claim fails because she cannot establish a causal relationship between reporting Melendez and her termination. Even if she could, her claim would fail on the second two steps of the three-step burden-shifting framework because Juniper Village has advanced a legitimate, non-discriminatory reason for Cagnetti's discharge and Cagnetti is unable to show that the reason is pretextual.

---

[8] Unlike for other ADA claims, "a plaintiff in an ADA retaliation case need not establish that he is a 'qualified individual with a disability.'" *Krouse*, 126 F.3d at 502. As a result, our

Juniper Village's Motion will be granted as to Counts Three and Seven.

### E.   Judgment will be entered in favor of Juniper Village in part on Cagnetti's Equal Pay Act claims (Count Four)

Cagnetti's last claim, Count Four, alleges violations of the Equal Pay Act.  "The Equal Pay Act prohibits discrimination on the basis of sex between employees with respect to compensation for the same or substantially the same work, except when the differential is the result of '(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex.'" *Thomas v. Comm. Coll. of Philadelphia*, 553 F. Supp. 2d 511, 514 (E.D. Pa. 2008) (quoting 29 U.S.C. § 206(d)(1)).  "The Equal Pay Act prohibits even a small difference in pay between members of opposite sexes performing equal work."  *Wildi v. Alle-Kiski Med. Ctr.*, 659 F. Supp. 2d 640, 664 (W.D. Pa. 2009) (citing *Hodgson v. Am. Bank of Commerce*, 447 F.2d 416, 420 (5th Cir. 1971)).  "Under the Equal Pay Act, a plaintiff does not need to prove that an employer intended to discriminate."  *Prise v. Alderwoods Grp., Inc.*, 657 F. Supp. 2d 564, 616 (W.D. Pa. 2009).

Unlike Title VII claims, which follow the three-step burden-shifting framework, EPA claims "follow a two-step burden-shifting paradigm.  The plaintiff must first establish a prima facie case by demonstrating that employees of the opposite sex were paid differently for performing 'equal work'—work of substantially equal skill, effort and responsibility, under similar working conditions."  *Stanziale v. Jargowsky*, 200 F.3d 101, 107 (3d Cir. 2000).  A "plaintiff only needs one comparator to establish her claim."  *Wildi*, 659 F. Supp. 2d at 660 (citing *EEOC v. White & Son Enters.*, 881 F.2d 1006, 1009 (11th Cir. 1989)).  Once the plaintiff

---

conclusion in the previous section is irrelevant to our ADA retaliation analysis.

establishes a *prima facie* case, the "burden of *persuasion* then shifts to the *employer* to demonstrate the applicability of one of the four affirmative defenses specified in the Act." *Stanziale*, 200 F.3d at 107 (emphasis in original).  To prevail on summary judgment, "the employer must prove at least one affirmative defense 'so clearly that no rational jury could find to the contrary.'"  *Id*. (quoting *EEOC v. State of Delaware*, 865 F.2d 1408, 1414 (3d Cir. 1989)). That is, the employer must "submit evidence from which a reasonable factfinder could conclude not merely that the employer's proffered reasons *could* explain the wage disparity, but that the proffered reasons do in fact explain the wage disparity."  *Id*. at 107-08 (emphasis in original).

For purposes of this Motion, Juniper Village concedes that Cagnetti can set forth a *prima facie* case.  As such, Juniper Village has assumed the burden of proving one of the four affirmative defenses under the EPA, e.g., a seniority system, a merit system, a system which measures earnings by quantity or quality of production, or a differential based on any other factor other than sex.  *See* 29 U.S.C. § 206(d)(1).  Presumably relying on the final, "catch all" affirmative defense, Juniper Village reiterates its argument that the pay discrepancies between Cagnetti and the other cooks were based on training and experience.  Again, while this argument may be plausible for several of the male cooks, it does not adequately account for all of them. Furthermore, even if Juniper Village's explanation *could* explain the wage disparity, the inconsistencies in Juniper Village's hourly rates for the various cooks make us reluctant to conclude on summary judgment that Juniper Village's reasons actually *do* explain the disparity.

To the extent it alleges unequal pay, Count Four may proceed to trial.[9]

---

[9] Cagnetti also brings a retaliation claim under the EPA, as permitted by the FLSA.  *See Marriott v. Audiovox Corp.*, No. 04-1307, 2006 WL 3805145, at *8 (W.D. Pa. Dec. 22, 2006); *Briscella v. Univ. of Pennsylvania Health Sys.*, No. 16-614, 2018 WL 6413305, at *8 n.9 (E.D. Pa. Dec. 4, 2018).  This type of retaliation claim is governed by the three-step burden-shifting

III.    **CONCLUSION**

For the foregoing reasons, Defendant's Motion for Summary Judgment will be granted in

part and denied in part.

An appropriate order follows.

**BY THE COURT:**

**/s/ R. Barclay Surrick_____**
**R. BARCLAY SURRICK, J.**

---

framework common to Title VII claims.  *See Rhoades v. Young Women's Christian Ass'n*, 423 F.
App'x 193, 198 (3d Cir. 2011); *Vereen v. Woodland Hills Sch. Dist.*, No. 06-462, 2008 WL
794451, at *26-27 (W.D. Pa. Mar. 24, 2008).  For the same reasons we dismiss Cagnetti's
retaliation claims in Counts One, Three, Five, and Seven, we dismiss her retaliation claim
brought pursuant to the EPA.